# DAVID H. FRYE v. ERDIE ANDERSON.

80 N. W. (2d) 593.

January 18, 1957—No. 36,858.

*Arthur J. Donnelly, David R. Roberts,* and *Sullivan, Stringer, Donnelly & Sharood,* for appellant.

*Merlyn C. Green, Jerome B. Simon,* and *Bundlie, Kelley & Maun,* for respondent.

NELSON, JUDGE.

Action by plaintiff to recover for personal injuries sustained in an accident occurring June 25, 1953, at the intersection of Rice Street and Ivy Avenue in St. Paul. At the end of the trial, the court below directed a verdict for defendant, refusing to submit

to the jury the question of his ownership of the truck involved in the accident. Plaintiff's motion for a new trial was denied, and plaintiff appeals from the judgment entered thereafter.

This appeal from the judgment involves review of the intermediate order denying judgment notwithstanding and a new trial and certain rulings on the evidence at the trial.

The rule that the reviewing court will view the evidence in the aspects most favorable to the verdict does not apply in this case where the trial court has directed the verdict.[1]

A recital of the following facts may be helpful: David Frye, the plaintiff, was injured when a truck operated pursuant to a city ash-hauler's license, allegedly issued to defendant and his son, and driven by one Donald Vitally, an employee, ran into the rear of plaintiff's automobile. The plaintiff, at the time, was stopped at the intersection to permit another vehicle to cross the intersection.

The defendant Erdie Anderson then lived at 120 East Wyoming Street in St. Paul and his son Raymond lived at the same house. Raymond's testimony at the trial which commenced October 27, 1955, fixes his age at 23 years as of that date.

It appears that the son had been engaged in the ash-hauling business during and prior to the month of June 1953 under a license issued to him by the city of St. Paul under Ordinance No. 8477 (Proceedings of the Council of City of St. Paul, 1943, p. 322). He had been using two trucks and had an employee or employees. Occasionally his father, the defendant herein, would go out with one of the trucks. Something had happened, which the record does not fully disclose, prior to June 3, 1953. The defendant indicated that he did not know what it was. It is clear that at that time Raymond had received notice that his rights under his ash-hauler's license would be terminated; his credit was in jeopardy and his insurance about to be cancelled; and he also faced the loss of his license. The evidence would indicate that only through the assistance of his father could he hope to continue in the business or in any event to obtain a renewal of his ash-hauler's license.

[1] See, 1 Dunnell, Dig. (3 ed.) § 415b, and cases cited.

Owing to this turn of events, several significant acts and meetings took place in which Erdie Anderson, the father, figured prominently and in the end so effectively that a renewal of the ash-hauler's license was issued to Raymond and Erdie Anderson on July 3, 1953, effective July 1, 1953, to June 30, 1954, pursuant to an application made June 3, 1953. The renewal application, signed by Ray Anderson, had asked for a license to be issued to both father and son as was done.

The testimony indicates that the defendant authorized his son to use his name to secure the renewal. The license application was approved on June 3, 1953, to be issued in the name of "Raymond & Erdie Anderson," the old license being definitely subject to expiration on July 1, 1953, unless certain requirements were met, and it may be inferred from the evidence that the defendant knew what those requirements were and what had to be done about it.

The record indicates that, prior to the date of the accident, the defendant had signed documents connected with the same ash-hauling business and with the purchase of the truck involved in the accident and the insurance on the ownership thereof. The defendant accompanied his son at the time they signed a conditional sales contract at Kon Kord Motors for the purchase of same truck February 12, 1953, the defendant on that occasion signing as customer the contract also designating him as a copurchaser. He testified that the truck was bought for the purpose of hauling ashes and rubbish and was so used from the day of purchase. It is clear from the defendant's testimony that he wanted the son to be able to use his name, and as he stated, "To see that he gets the truck" and in buying the truck. The exhibits disclose that an insurance sales order was issued at the time of the purchase in defendant's name only for personal liability and property damage insurance for two Ford trucks signed only by defendant three or four days prior to the accident. It does not appear from the testimony that the defendant personally made any of the payments on the conditional sales contract. It does appear that trucks, which the son had used in the ash-hauling business prior to obtaining this one, had been carried in defendant's name.

The conditional sales contract by its terms had 24 months to run and a balance of $2,406.96 to be paid at the time of purchase. The payments were thereafter made from the profits of the ash-hauling business. The fire and collision insurance issued by the seller at the time of the purchase, which plaintiff claims was erroneously rejected as evidence below, recited both Erdie Anderson and Ray Anderson as "purchaser/insured."

Application for an ash-hauler's license must be made in compliance with Ordinance No. 8477. Section 2 of the ordinance provides in part as follows:

"Any person desiring a license to remove, transport or carry any of the waste matter or material aforesaid in the City of Saint Paul shall make application therefor to the City Clerk. *Said applicant* shall file with the City of Saint Paul a policy or policies of insurance, *insuring said applicant* in the sum of $10,000 against liability imposed by law on account of damages for injuries to persons, and in the sum of $5,000 against liability imposed by law on account of damage to or destruction of property by reason of the ownership or operation of the vehicle to be used *by said applicant* under the terms of this ordinance. *Each applicant* must furnish satisfactory proof of his compliance with such requirement to the City Clerk before any license will be granted." (Italics supplied.)

The evidence indicates that the insurance policy which was required to accompany an application for license and be on file with the city was being carried by the son and that it would expire June 22, 1953, without his being able to renew it. At the time of the purchase of the truck February 12, 1953, title registration was placed in the name of Raymond Anderson, alone, as owner. However, when the new insurance policy, required under Ordinance No. 8477, had to be provided to accompany the application for the renewal of the ash-hauler's license, it became necessary for the defendant to join with his son in the application for this insurance policy and this was done either on the 21st or the 22nd of June 1953 by going to the Robert Street Auto Mart where they transacted and completed their part necessary to comply with the requirements

of the ordinance. At that time the defendant, his son, and one Harry Nelson, representing the insurance agency, were present at the insurance office for the purpose of effecting license registration of the truck in defendant's name and of supplying the new insurance policy in his name effective June 22, 1953, for the period of one year. This had to be done to prevent cancellation of the ash-hauler's license before the expiration of its term and to provide for a renewal in the name of defendant and his son. This insurance policy was issued to the defendant, in his name, alone, and he paid the required insurance premium due on that day in the amount of $50, which the record would indicate was later repaid by the son, most likely out of the profits of the business. The father had with him the license registration card on the truck and gave this to Harry Nelson at the same meeting, the parties completing what was necessary to effect the transfer while present so that the insurance policy could be obtained and immediately made effective from June 22, 1953, in defendant's name for a one-year term.

Item 1 of the policy reads as follows:

"Item 1.    *Name of Insured    Ernest Anderson*
"Address    120 East Wyoming Street, St. Paul, Minnesota
                  \*    \*    \*    \*    \*

"Occupation of the Named Insured is Ash Hauler—Self

"Any loss under coverages D, E, F, G, H and I *is payable as interest may appear to the Named Insured and City of St. Paul, Minnesota*" (Italics supplied.)

The evidence is clear that as of June 22, 1953, the insurance policy did not include the son's name. It was issued to the defendant as the insured.

Items 4 and 6 of that policy read as follows:

"Item 4.    Description of the automobile and *facts respecting its purchase by the Named Insured:*
                  \*    \*    \*    \*    \*

"See schedule attached
                  \*    \*    \*    \*    \*

484

"Item 6. Except with respect to bailment lease, conditional sale, mortgage or other encumbrance the *Named Insured is the sole owner of the automobile except as herein stated*: *No Exceptions*" (Italics supplied.)

To this policy was added an endorsement entitled "St. Paul Ash Haulers Endorsement" made effective June 22, 1953, forming a part of the policy. This endorsement read in part as follows:

"*It is understood and agreed that the right of any person to recovery hereunder shall not be affected by any violation of any of the provisions of the policy, but all the terms and conditions of the policy shall remain in full force and be binding upon the Company and the Assured.* The Assured agrees to reimburse the Company for any and all loss, costs or expenses paid or incurred by the Company, which the Company would not be obligated to pay under the provisions of the policy independently of this endorsement.

"*It is also agreed that no cancellation of the policy at the request of the named Assured or by the Company shall become effective until after the expiration of ten days written notice of such proposed cancellation has been filed with the License Inspector of the City of St. Paul, Minnesota.*" (Italics supplied.)

The insurance policy remained in full force and effect in the name of Ernest Anderson, the defendant, as the insured so far as the truck in question is concerned until it was disposed of only shortly before the trial without any change as to title registration or ownership certificate.

In order to accomplish the aforesaid results, the defendant signed the acceptance of title on the truck, completing the transaction between himself and his son at this one meeting with Nelson. Even though the matter of writing the policy was not completed until about July 2, 1953, nor the registration transfer notarized and completed until July 1, 1953, both had previously been placed in order so that the city license issued when needed to avoid expiration and the insurance was made effective June 22, 1953. The evidence may well establish that the defendant fully intended to become the registered owner of the truck on the date the new insurance policy

became effective, which was three or four days before the accident occurred. There was no later meeting between the parties, nothing further to be done on their part, and the necessary paperwork was completed in due time by the Robert Street Auto Mart as to the insurance, by the office of the secretary of state as to truck ownership registration, and by the office of the city clerk on the matter of the renewal of the license. They intended the insurance to be effective June 22, 1953, and no one denies that it became effective then. It can be inferred from the circumstances coupled with the record that insofar as defendant and his son were concerned they expected and intended a completed transaction on their part effective on that date. They must have understood that the paperwork was a matter that had to be followed up later, which necessarily meant that the final documents would be dated and received later. They no doubt understood that what they were assured of when the meeting ended was effective insurance to prevent a lapse of policy filed with the city and also to prevent the loss of the ash-hauler's license still in effect, as well as any prospect of renewal.

The testimony, as well as the admissions of both defendant and his son, is revealing both as to purpose and intention in what appears to be a joint effort to save and renew an existing license in order to continue the ash-hauling business, which the son had theretofore operated under the license in his own name. Both fixed the date when they appeared to have fully completed all necessary arrangements to effect a renewal as either the 21st or the 22nd of June 1953.

There is no difficulty, after a reading of their testimony, in reaching the conclusion that the son had to have assistance from his father to obtain the insurance or he would lose his license, and, in order for the defendant to apply for and obtain the required insurance, it was necessary for him to have the ownership certificate and registration changed as to the truck so that it would reflect ownership in him. The son apparently could not obtain either the ash-hauler's license or the necessary insurance to support his application on his own.

The testimony of the defendant indicates that he was regularly employed away from home. However, on weekends and days off he would work on the trucks and personally engage in trash-hauling operations. He knew the routes and he had control over the routes driven and of the driver who was with him at the time. While the son looked after business operations in general, employed and paid the help, and made payments on the truck out of the profits of the business, it was understood between defendant and his son, according to their own characterization, that if the son went into the service "or if anything would happen to me [Raymond], * * * that my father would take over the business and take care of my— [business]." Raymond stated further that he did not go into service but "We had it understood in the family that that is the way it would be."

■ There is a marked conflict between plaintiff's answers to the first and the second series of questions and also as between the defendant's testimony and that of his son. This conflict requires that the credibility of the witnesses be reconciled by a jury determination. When this testimony and the record generally, including the documentary evidence, is viewed in its conflicting state, it presents jury questions as to purposes and intentions of parties.

As the record now stands we have before us the question of whether the court erred in not submitting to the jury the question of the ownership of the truck; whether the evidence was such that it created fact issues for the jury in view of the representations made in connection with and contained in the conditional sales contract, the insurance policies, the title registration of the truck, and the application for the ash-hauler's license, all of which disclose that without defendant's intervening directly in all these matters a renewal of the city license would not have been possible.

Plaintiff in his motion below assigned error upon six separate grounds. His third assignment reads as follows:

"That the Court erred in not submitting to the jury the question of the ownership of the truck by said defendant, the evidence being

such that it created a jury issue as to whether the defendant in fact owned said truck, and in directing a verdict for the defendant."

Since we must reach the conclusion from the foregoing facts that the record presents issues for determination by the jury, our main consideration will be directed to this assignment.

■ In the instant case the evidence presents for determination the fact questions as to the bona fide ownership of the person ostensibly holding the title. The triers of fact are entitled to look through form to substance and determine the realities from the conduct of the parties. More may be considered than the naked title to the motor truck in determining who is the owner.

The evidence raises the question as to who actually participated in obtaining the new license registration on the truck, what the parties intended, and what were their purposes.

Did the defendant in effect give directions for the truck to be registered in his name? Did the son acquiesce and also join in such directions? Why did defendant and his son proceed, beginning with the purchase of the truck on February 12, 1953, to make new arrangements throughout in the manner which they did up to and including the final meeting on June 21 or 22, 1953, when nothing was left undone but the paperwork necessary to round out and ultimately make the arrangement a completed fact upon the records of the secretary of state and the offices of certain local officials in the city of St. Paul?

■ The Highway Traffic Regulation Act, M. S. A. 169.01, subd. 26, defines "owner" of a vehicle.[2] Section 168.011, subd. 5, also defines "owner" of a motor vehicle.[3] Also see "motor vehicle" and "owner"

---

[2] "'Owner' means a person who holds the legal title of a vehicle, or in the event a vehicle is the subject of an agreement for the conditional sale or lease thereof with the right of purchase upon performance of the conditions stated in the agreement and with an immediate right of possession vested in the conditional vendee or lessee, or in the event a mortgagor of a vehicle is entitled to possession, then such conditional vendee or lessee or mortgagor shall be deemed the owner for the purpose of this chapter."

[3] "'Owner' means any person, firm, association, or corporation owning or renting a motor vehicle, or having the exclusive use thereof, under a lease or otherwise, for a period of greater than 30 days."

in § 514.39, and § 170.21, subd. 9, "owner" when used for purposes of M. S. A. c. 170.

The present Safety Responsibility Act, L. 1945, c. 285, has been codified as §§ 170.21 to 170.57, superseding L. 1933, c. 351, codified as M. S. A. 1941, §§ 170.01 to 170.19. Section 170.21, subd. 9, defines "owner" in substantially the same terms as § 169.01, subd. 26. Section 170.53 provides that c. 170, designated as the Safety Responsibility Act, "is not a repeal of the Highway Traffic Regulation Act or the Drivers License Law but is supplementary thereto."

Section 170.54 provides that "Whenever any motor vehicle, after Laws 1945, Chapter 285, becomes effective, shall be operated upon any public street or highway of this state, by any person other than the owner, with the consent of the owner, express or implied, the operator thereof shall in case of accident, be deemed the agent of the owner of such motor vehicle in the operation thereof."

Section 168.10 provides for "Listing for Taxation; Registration"; and § 168.15 is entitled "Rights as to Registration Certificates and Number Plates," and provides in part:

"* * * When any person seeks to become the owner by gift, trade, or purchase of any vehicle for which a registration certificate has been theretofore issued under the provisions of this chapter, he shall join with the registered owner in transmitting with his application the registration certificate, with the assignment and notice of sale duly executed upon the reverse side thereof, or, in case of loss of such certificate, with such proof of loss by sworn statement, in writing, as shall be satisfactory to the registrar. Upon the transfer of any motor vehicle by a manufacturer or dealer, for use within the state, whether by sale, lease, or otherwise, such manufacturer or dealer shall, within seven days after such transfer, file with the registrar a notice or report containing the date of such transfer, a description of such motor vehicles, and the name, street and number of residence, if in a city, and the post-office address of the transferee, and shall transmit therewith the transferee's application for registration thereof."

This court has held that registration of a motor vehicle pursuant to the statute does not establish or determine title to a vehicle; that the registration of the car under the state motor vehicle law in defendant's name is prima facie, but not conclusive, evidence of defendant's ownership; and that evidence is admissible to show that the title is different from that appearing from the registration. Holmes v. Lilygren Motor Co. Inc. 201 Minn. 44, 275 N. W. 416; Bolton-Swanby Co. v. Owens, 201 Minn. 162, 275 N. W. 855, 22 Minn. L. Rev. 720; Flaugh v. Egan Chevrolet, Inc. 202 Minn. 615, 279 N. W. 582.

In the Holmes case, *supra*, this court, after considering the arrangement between the parties to that action, said (201 Minn. 49, 275 N. W. 419):

"* * * It is no doubt true that the transfer on the registry card was *prima facie* evidence of ownership of defendant, the transferee, but, as stated, it was not conclusive." Citing Ferris v. Sterling, 214 N. Y. 249, 108 N. E. 406, Ann. Cas. 1916D, 1161.

The Holmes case involved the question of possession and control of an automobile by virtue of the sale thereof to one of defendant's salesmen under a conditional sales contract.

In Ferris v. Sterling, *supra*, both father and son asserted that the car was the son's; both testified that the car was given to the son on his 21st birthday. The license, however, issued by the secretary of state, was made out in the father's name and the fire insurance and the accident insurance policies were issued in the same form. Both father and son claim that the form of the license and the policies was due to a mistake. In that case the defendant's son, while in charge of the automobile, ran down a motorcycle and killed the man who was on it. Suit was brought against the father as defendant. Much of the evidence offered by them to prove that the car was mistakenly registered in the father's name was excluded. The New York statute is similar to § 170.54 of our Safety Responsibility Act. The verdict in that case was for the plaintiff. The New York Court of Appeals said (214 N. Y. 253, 108 N. E. 407): "The license number of the car, coupled with evidence that the defendant held the

license, was *prima facie* proof that the defendant was the owner. It was more than that; it was *prima facie* proof that the custodian of the car was then engaged in the owner's service. [Cases cited.]" The court went on to say:

"\* \* \* 'The property being proved to belong to the defendant, \* \* \* a presumption arises that it was in use for his benefit, and on his own account.' \* \* \* This presumption was not destroyed, as a matter of law, by the testimony for the defendant. Even though his explanation of the use of the car would absolve him if credited, the question whether it should be credited was one of fact for the jury. \* \* \* The defendant and his son were not called as the plaintiff's witnesses, and their narrative was not without its suspicious or improbable features. The jury may not have believed the son's statement that as he went forth on this ride the father said to him, your time is your own, and the car your own. They may have thought that witnesses who would falsely disclaim ownership of a car, would falsely disclaim responsibility for its management. These and like considerations were for them. The motion to dismiss the complaint was, therefore, properly denied."

Since in the Ferris case declarations and acts of the defendant were used against him as admissions tending to show an inconsistent attitude regarding the ownership of the motor vehicle, the court held that it was open to him to explain the apparent contradiction and that the exclusion of certain letters in connection with the licensing of the car did violence to that rule.

Plaintiff in the case at bar cites the Ferris case and also Elfeld v. Burkham Auto Renting Co. 299 N. Y. 336, 87 N. E. (2d) 285, 13 A. L. R. (2d) 370. The latter case held that, in the absence of evidence to the contrary, the registered owner of an automobile is presumed to be the actual owner thereof and that (299 N. Y. 343, 87 N. E. [2d] 288, 13 A. L. R. [2d] 375) "The license number of the car, coupled with evidence that the defendant held the license, was *prima facie* proof that the defendant was the owner." The court considered the question whether one who has deliberately caused a car to be registered in his name as owner will be permitted, after

it has been involved in an accident and caused injury, to deny the truth of that statement. The position of defendant was that no liability could be imposed on it, either under the statute or at common law, because at the time of the accident it was not in fact the owner of the truck, and in explanation of that circumstance defendant's counsel stated for the purposes of the record that in 1941 defendant leased and later sold its trucks to a bakery company and that thereafter in April 1944, its trucks, including the truck involved in this accident, were bought by the decedent's employer. The defendant Burkham, however, conceded that—due to the rationing system then in effect—the new owner continued to register the truck involved in the name of Burkham Auto Renting Co. The court said (299 N. Y. 343, 87 N. E. [2d] 289, 13 A. L. R. [2d] 375) "To permit the respondent to relieve himself of liability by proving that he was not in fact the owner of the automobile and thereby establish his illegal and fraudulent act in procuring its registration in his own name would be against public policy and would encourage fraudulent and illegal deceptions on the State in procuring the registration of automobiles in the names of persons who were not the owners thereof, directly in violation of the statute." The New York court concluded that the defendant Burkham must be considered the owner of the truck and that its disclaimer of ownership at the time of the accident did not— on the record before it—constitute a legal defense. Judgment for defendant was accordingly reversed and a new trial granted.[4]

In Minnesota the registration of a motor vehicle under the state motor vehicle law is prima facie, but not conclusive, evidence that the person in whose name an automobile is registered is the owner

---

[4]In the Elfeld case the opinion cites § 59 of the New York Vehicle and Traffic Law (62A McKinney's Consol. Laws of New York Ann. § 59), which is similar to our own Minnesota provisions and which provides as follows: "Negligence of operator other than owner attributable to owner

"Every owner of a motor vehicle or motor cycle operated upon a public highway shall be liable and responsible for death or injuries to person or property resulting from negligence in the operation of such motor vehicle or motor cycle, in the business of such owner or otherwise, by any person legally using or operating the same with the permission, express or implied, of such owner."

thereof. Hence, prima facie, the defendant was the owner of the truck by reason of the registration thereof in his own name. The effective date of the ownership certificate presents a fact question. Owing to the recitals of ownership which the other documentary proof contains, he also was the presumptive owner thereof. State v. One Oldsmobile Sedan, 227 Minn. 280, 35 N. W. (2d) 525.

■ We have held under the Safety Responsibility Act, defining "owner" of motor vehicle for purposes of imposing liability, that the elements which must be proved include that owner was in fact an "owner" as that term is interpreted within the statute; that use was with express or implied consent of owner; and that the permittee's or driver's negligent operation or use caused the damage complained of. Aasen v. Aasen, 228 Minn. 1, 36 N. W. (2d) 27. See, 21 Minn. L. Rev. 823. The intention manifested is controlling in the present case, and under the evidence we conclude that the jury is entitled to say what the intention of the parties may have been. Ludwig v. Haugen Motor Co. 187 Minn. 315, 245 N. W. 371.

Controlling considerations in impressing liability are discussed in Kangas v. Winquist, 207 Minn. 315, 291 N. W. 292. The presence of these elements in the ordinary situation spells liability for the owner of a negligently driven vehicle. The statute is aimed at imposing liability on those who have ownership and the power and right to prevent use of the vehicle. Nothing indicates that the policy of the law is such that it was not intended to operate under circumstances such as the situation here.

Section 170.54 is a remedial statute required to be liberally construed. In Christensen v. Hennepin Transp. Co. Inc. 215 Minn. 394, 411, 10 N. W. (2d) 406, 416, 147 A. L. R. 945, 957, the court said:

"* * * The duty to construe a remedial statute liberally simply means that the court should so apply it as to suppress the mischief sought to be avoided by affording the remedy intended. It stops short of extending a statute to purposes and objects not mentioned therein."

Might we not infer from defendant's admissions and the evidence as a whole that, while father and son occupied the same home, the

defendant either had or shared dominion over the truck whenever he chose to exercise it? It appears from the testimony that the title to the trucks which the son operated in the ash-hauling business were carried in the defendant's name prior to the time the present truck was purchased on February 12, 1953.

■ The plaintiff argues that the defendant's acts and conduct, and those of his son, were such as to bind him as a partner in the ash-hauling venture as to third parties. His intentions seem to have been clear throughout to assume title and ownership to the trucks as well as control so that the business in which the son was engaged would continue as a going concern. See, Tyler v. Omeis, 76 Minn. 537, 79 N. W. 528. If, in situations such as this, there is evidence of representations, conduct, and circumstances naturally calculated or likely to beget the belief that the parties were partners, it is sufficient to make the question one for the jury. Of necessity such evidence must often be largely circumstantial, but it is within the province of the jury to decide on the sufficiency of the proffered explanation.[5]

It has been held in Minnesota as well as in other jurisdictions under the common law of partnership that, where there was a holding out of a partnership relation, liability for negligence may result without an actual partnership relation. If the holding out is such that estoppel applies, it may extend to tort actions as well as to matters of credit or contract.[6]

Plaintiff argues that defendant was estopped as a matter of law from asserting that he did not own the car on the ground that such

[5]M. S. A. 323.15, subd. 1, governs the law of ostensible partnership; also, see, § 323.04; 14 Dunnell, Dig. (3 ed.) § 7348; Hart Publications, Inc. v. Kaplan, 228 Minn. 512, 37 N. W. (2d) 814; Kangas v. Winquist, *supra;* Wise v. Morrissey, 135 Minn. 481, 160 N. W. 487; Tyler v. Omeis, *supra;* Rosenbaum v. Howard, 69 Minn. 41, 71 N. W. 823.

[6]Jewison v. Dieudonne, 127 Minn. 163, 149 N. W. 20; Cermak v. Sevcik, 215 Minn. 203, 9 N. W. (2d) 508; McBriety v. Phillips, 180 Md. 569, 26 A. (2d) 400; Pump-It, Inc. v. Alexander, 230 Minn. 564, 42 N. W. (2d) 337; Blumberg v. Palm, 238 Minn. 249, 56 N. W. (2d) 412; Hansen v. Adent, 238 Minn. 540, 57 N. W. (2d) 681.

proof would permit and encourage fraudulent and illegal deceptions in procuring registrations of automobiles in the names of persons who were not the owners thereof in violation of the statute, and on the further ground that the collision and the resulting injury and damage to plaintiff was due entirely to the negligence of the operator of the truck. He cites Shuba v. Greendonner, 271 N. Y. 189, 2 N. E. (2d) 536, in which defendant registered car used by son in his own name and the court held it to be reversible error to permit defendant to prove that negotiations for purchase were carried on by the son and that the son paid the purchase price, license fee, insurance premiums, and upkeep. Plaintiff also cites Elfeld v. Burkham Auto Renting Co. *supra;* Cermak v. Sevcik, *supra;* Shindelus v. Sevcik, 211 Minn. 432, 1 N. W. (2d) 399; Jewison v. Dieudonne, *supra,* in further support of his argument.

We recognize that estoppel by conduct or in pais is to be distinguished from the technical common-law estoppel by deed, and that it is true that the former is a favorite of the law while the latter is not; also that estoppel in pais is often useful as an application of the principle that where, one of two innocent persons must suffer from the act of another, he must bear the loss who made such act possible. While estoppel is said to be a mere rule of evidence, this court has also considered it as in reality one of substantive law and a most useful and flexible working tool in our law. It is a doctrine that requires of a party consistency of conduct when inconsistency would work substantial injury to the other party.[7]

We have, however, in the instant case questions for jury determination upon the issues of whether the ownership certificate to the truck, at the outset, prima facie, but not conclusive, became effective and binding upon the defendant from June 22, 1953, the date when it is conceded that a new insurance policy became effective in his name as part of the same general transaction; also the presumptive ownership of the truck which the documentary evidence gives rise to on inspection thereof.

---

[7]See, 6 Dunnell, Dig. (3 ed.) §§ 3185 to 3187.

Since we have indicated that there must be a new trial with submission of fact issues to a jury, we will leave the matter of application of the doctrine of estoppel to the discretion of the trial court at another trial, then to determine whether applicable to the state of facts adduced at such trial.

██ Plaintiff's assignment of error as to the court's rejection of the offer in evidence of plaintiff's exhibit "E", an insurance policy applied for and issued at the time the truck in question was purchased, was well taken. The conditional sales contract issued in connection with that purchase was admitted in evidence and foundation thereby laid for the admission of the insurance policy which was issued to satisfy the requirements of the contract with its declarations of ownership. It was error not to receive it in evidence.

In the present case the testimony of defendant was conflicting and evasive. It would appear from the record that whoever was, in fact, the owner of the truck was liable for damages occasioned by the driver's negligence. Defendant's son admitted that Donald Vitally was driving the truck at the time of the accident. Under the Safety Responsibility Act and the other statutes to which it is supplementary, the question as to the ownership of the truck at the time of the accident, as well as the resulting liability, was for the jury.

It was therefore error to direct a defendant's verdict.

Reversed and a new trial granted.