The BANK NORTH, f.k.a. North Star Bank Minnesota, f.k.a. Crystal State Bank, Appellant,

v.

Greg Gerald SOULE, et al., Respondents.

No. C1-87-144.

Court of Appeals of Minnesota.

July 28, 1987.

Review Granted Sept. 30, 1987.

Lawrence P. Marofsky, Minneapolis, for appellant Bank North.

George E. Antrim, Minneapolis, for respondent Tabata.

John S. Jackson, William J. Zwart, Minnesota Bankers Ass'n, Minneapolis, for amicus curiae Minnesota Bankers Ass'n.

Heard, considered and decided by RANDALL, P.J., and WOZNIAK and NIERENGARTEN, JJ.

## OPINION

WOZNIAK, Judge.

In this appeal, appellant, The Bank North (Bank), contends the trial court erred by failing to recognize its security interest in a Corvette. We disagree and affirm.

## FACTS

In September 1980, respondent Greg Soule sold his Chevrolet Corvette to respondent Bryan Tabata because he could no longer make the monthly General Motors Acceptance Corporation (GMAC) pay- ments. Soule and Tabata had been friends since high school and did not transact a formalized, documented sale. Soule simply gave Tabata his GMAC coupon book and he assumed the monthly payments. The GMAC loan remained in Soule's name and neither party notified GMAC that the Corvette had been sold. Although Tabata is an officer and manager of Auto Truck Service and Supply Co., he used his personal funds for the monthly GMAC payments; however, Auto Truck Service paid for the car insurance. Tabata did not pay any sales tax on the Corvette and did not request that the certificate of title be transferred to his name.

In 1983 Soule asked Tabata to pay the balance due on the GMAC loan. The loan was still in Soule's name and it had to be satisfied before he could borrow additional funds from Bank. On March 2, 1988, Tabata gave Soule a check for $4,208.23 to cover the balance due on the GMAC loan. At this time and on several subsequent occasions, Tabata requested Soule to provide him with the certificate of title. Soule responded to these requests by stating he had misplaced the certificate during a recent move. Neither party attempted to secure a replacement certificate.

In August 1983, six months after Tabata had paid the GMAC loan in full, Soule applied for and received a $6,000 loan from Bank. As collateral for the loan, Soule pledged the Corvette in Tabata's possession. To secure its interest, Bank obtained Soule's certificate of title and filed its interest.

On the loan application, Soule listed Tabata as his first personal reference. Bank did not contact Tabata or any of the references listed on the application. It also did not verify whether or not there was insurance on the Corvette and was unaware that Tabata had been paying for the insurance. Furthermore, it made no inquiries regarding the payoff of the GMAC note and did not physically look at or inspect the Corvette.

Soule maintained his loan payments to Bank until July 1984 when Bank agreed to revise his loan to provide him with addition-

al funds for a divorce settlement. On his application for revision dated July 24, 1984, he again listed Tabata as his first personal reference. Tabata's place of employment, "Auto Truck Service Company," followed his name which is followed by the notation "car stored." At the time of this revision, Bank knew the Corvette was stored with Tabata. Although the loan application also lists Tabata's telephone number, Bank made no efforts to contact Tabata regarding his interest in the Corvette.

In November 1984, Bank notified Soule that he was delinquent on his loan payments. It proposed rewriting the loan whereby Soule would only be responsible for interest payments until spring when the Corvette could be sold to satisfy the principal owing. Soule agreed to this arrangement but failed to make the corresponding interest payments. Bank sent Soule a repossession letter and in April 1985 notified Tabata that the Corvette was being repossessed. Tabata then informed Bank that he was not merely storing the Corvette, but was the owner since he had purchased it from Soule. Bank had no further contacts with Tabata and proceeded to seek advice of counsel.

The dispute came to trial in June 1986. Tabata and Bank representatives testified. Soule did not make an appearance. The trial court made several findings, including:

1. that sometime in mid–1980 Soule offered to sell the Corvette to Tabata;
2. that Tabata took possession of the car in exchange for assuming Soule's GMAC payments;
3. that Soule never delivered the Certificate of Title to Tabata despite repeated demands;
4. that [appellant] did not inform Tabata of its security interest until some three years after Tabata had satisfied the GMAC loan;
5. that the parties stipulated that if a jury were presented with the issue of ownership they would find that ownership had been transferred from Soule to Tabata on March 2, 1983;
6. and, that Tabata justifiably relied on the false statement of Soule that "I

can't find the certificate of title, but I will deliver it to you when I find it."

The trial court concluded that Tabata had equitable title to the Corvette from at least March 2, 1983. The court refused to recognize Bank's security interest because after March 2, 1983, Soule did not have an ownership interest to collateralize. Tabata was granted physical possession and control of the Corvette. This appeal followed.

## ISSUE

Did the trial court err in denying appellant's security interest?

## ANALYSIS

Trial court findings must not be set aside upon review unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses. Minn.R.Civ.P. 52.01; *Peterson v. Johnston,* 254 N.W.2d 360, 362 (Minn.1977). In contrast, an appellate court owes no deference to the trial court's conclusions of law. *Yost v. Millhouse,* 373 N.W.2d 826, 829 (Minn.Ct.App.1985).

The present record does not indicate the trial court made clearly erroneous findings establishing Tabata's ownership interest. The crux of this appeal is whether or not the trial court correctly applied the law in deciding that Tabata was the true owner of the Corvette despite his failure to obtain Soule's certificate of title. According to the Certificate of Title Act:

> If an owner transfers his interest in a vehicle other than by the creation of a security interest, he shall at the time of the delivery of the vehicle execute an assignment and warranty of title to the transferee in the space provided therefor on the certificate or as the department prescribes.

Minn.Stat. § 168A.10, subd. 1 (1984). Although the certificate of title places responsibility for effectuating the transfer of interest on the seller of the vehicle, possession of the certificate of title merely creates a rebuttable presumption of ownership. *See Arneson v. Integrity Mut. Ins. Co.,* 344 N.W.2d 617, 619 (Minn.1984); *BLC*

*Ins. Co. v. Vivent,* 359 N.W.2d 315, 317 (Minn.Ct.App.1984).

■ Tabata has rebutted the presumption of ownership created by Soule's possession of the certificate of title. Pursuant to agreement, title passed when Tabata took physical possession of the Corvette, assumed the GMAC payments, satisfied the loan some six months prior to Soule's transactions with Bank, and had possession of the Corvette during the whole time period.

■ Although compliance with the title transfer requirements establishes a conclusive presumption that a sale has taken place, noncompliance with the transfer provisions of Minn.Stat. § 168A.10 does not preclude the titleholder from presenting extrinsic evidence establishing a sale despite the fact that title registration remained unchanged. *See Welle v. Prozinski,* 258 N.W.2d 912, 916 (Minn.1977).

Bank and the Brief Amicus Curiae supplied by the Minnesota Bankers Association argue that the "rebuttable presumption rule" of the Certificate of Title Act is limited to the facts of the cases espousing the rule. The "rebuttable presumption rule" has been developed through cases involving the avoidance of vicarious liability under the Safety Responsibility Act, Minn.Stat. § 170.54 (1984), and the avoidance of the compulsory insurance provisions of Minn. Stat. § 65B.48 (1984). *See Arneson,* 344 N.W.2d at 617; *Welle,* 258 N.W.2d at 912; *BLC Inc.,* 249 N.W.2d at 315.

Bank and the Brief Amicus Curiae argue that the trial court erred by failing to recognize a distinction between accident victims and lending institutions with regard to the "rebuttable presumption rule." According to Bank's theory, an accident victim's only concern about ownership of the vehicle is the source of recovery for his injuries, whereas lending institutions specifically rely upon a certificate of title as evidence of ownership in making their credit decisions.

■ However, the underlying basis of the "rebuttable presumption rule" invalidates this distinction since our supreme court has stated the rule focuses on *when* the parties intended title to pass, rather than on *why* ownership is at issue. *See Gibeau v. Mayo,* 280 Minn. 170, 175, 158 N.W.2d 589, 592 (1968). The proper forum for appellant's and the amicus curiae's argument is before the legislature. Application of the "rebuttable presumption rule" does not depend upon whether or not a financial institution is involved.

The dissent relies on the trial court's distinction between legal and equitable title. We have not adopted that rationale since the supreme court has not utilized this distinction, but has stated "title has passed," "ownership has changed," "facts establishing a sale," "transfer of interest," etc. (cases cited supra).

If title passed, as facts herein conclusively show, we refuse to split the ownership concepts to accommodate a lending institution. Further, Bank's attorneys (as well as employees) are well aware of the rebuttable presumption rule. Accordingly, we note here the Bank's complete failure to inquire about any facet of the transaction, notably its failure to contact Tabata when it knew the car was stored at Tabata's place of employment and that Tabata was Soule's primary personal reference. A simple inquiry would have obviated the problem and the lawsuit.

### DECISION

The trial court correctly refused to recognize appellant's security interest and properly granted respondent Bryan Tabata possession of and title to the Corvette.

Affirmed.

RANDALL, Judge, dissenting.

I respectfully dissent. The majority concentrates on the trial court's finding that Tabata was the equitable owner of the vehicle at the time Soule brought the certificate of title to his bank for loan purposes. I agree that Tabata could claim to be at least the equitable owner of the vehicle as of that date, March 3, 1983. His attorney stipulated at the June 17, 1986, hearing that:

> Mr. Tabata would testify for the jury on those questions that he had made payments on the vehicle from 1980 and that he had in fact paid off the vehicle some-

time in late '82 or '83 in full prior to Mr. Soule coming to the bank to pledge the vehicle; that based upon those facts, it is my belief and I would stipulate that the jury would come back finding that Mr. Tabata believed himself to be the owner of that vehicle, and that they would find that at least equitable interest had transferred.

However, I disagree with the majority conclusion that Tabata's "equitable" claim of ownership was enough to defeat the bank's secured interest. Minn.Stat. § 168A.10, subd. 3 (1984) sets out the specific statutory sections to be complied with to transfer ownership of a motor vehicle.

I do not agree the fact that equitable title may have passed in March of 1983 affects the transaction between Soule, who held the certificate of title, and the bank, which relied on Soule's possession of the certificate as evidence of legal title.

Here, Soule presented a certificate of title to a bank for purposes of obtaining a loan. The bank, in good faith, relied on the certificate of title as evidence of ownership. The cases cited to show how the presumption of ownership, as evidenced by a certificate of title, may be rebutted, do not address the situation. *Welle v. Prozinski*, 258 N.W.2d 912 (Minn.1977) and *BLC Insurance Co. v. Vivent*, 859 N.W.2d 815 (Minn.Ct.App.1984) allowed a good faith seller to rebut the presumption of ownership to avoid liability under Minnesota's vicarious responsibility rule[1] governing the effective transfer of motor vehicles.[2] *Arneson v. Integrity Mutual Insurance Co.*, 344 N.W.2d 617 (Minn.1984) (Expanded the rule to the avoidance of the compulsory insurance provisions of Minn.Stat. § 65B.48 (1982).

The rationale of giving bona fide sellers a defense to a lawsuit, if they can prove a legitimate sale, has no application to these facts. Lending institutions making motor

vehicle loans must be able to rely on the certificate of title. They are not pawn shops where the collateral is held in storage and then only released when the debt is paid. They commonly make loans on mobile collateral which may be miles, states, or even countries apart from the lender.

Until the Minnesota Supreme Court or the legislature specifically extends the rebuttable presumption rule formulated in vicarious liability cases to lending institutions, I would apply the strict provision of Minn.Stat. § 168A.10, subd. 5, and hold that Soule's physical delivery of the car to Tabata unaccompanied by the owner's certificate of title did not deprive appellant bank of its first lien.

---

1. Minn.Stat. § 170.54 (1984).

2. The purpose for this rebuttable presumption to benefit sellers is basic fairness. Once a person has made a bona fide sale of a vehicle, the seller no longer has control over who drives it and is not in a position to establish a "permissible driver." Thus, the seller is not accountable if the permissive driver of the new owner has an

accident. Without this rebuttable presumption, Minnesota's vicarious liability rule could hold liable a previous owner of a vehicle who no longer has any knowledge of who is driving it, but is unaware that the buyer has not completed the necessary paper work to transfer title to himself.