The BANK NORTH, f.k.a. North Star Bank Minnesota, f.k.a. Crystal State Bank, Petitioner, Appellant,

v.

Greg Gerald SOULE, et al., Respondents.

No. C1–87–0144.

Supreme Court of Minnesota.

March 18, 1988.

---

Lawrence P. Marofsky, Minneapolis, for appellant.

George E. Antrim, Minneapolis, for respondents.

KELLEY, Justice.

When a lender, as security for repayment of a loan, accepts a motor vehicle certificate of title which on its face names the borrower as the vehicle's owner, does such lender have priority to the possession of the vehicle for the purpose of foreclosing on its security as against one, who prior to the time of the pledge, had purchased the vehicle, but who neither acquired the certificate of title nor had his interest memorialized on the certificate? The trial court denied the lender that claimed priority. A divided court of appeals affirmed. *Bank North v. Soule,* 409 N.W.2d 556 (Minn.App.1987). We reverse.

Sometime in 1980 Greg Soule acquired title to a 1978 Chevrolet Corvette (Corvette). Its purchase was financed by the General Motors Acceptance Corporation (GMAC), which thereafter had a security interest in the Corvette and held the title certificate.

Soule had been a friend of respondent Bryan Tabata since high school days. Tabata claims that approximately six months after Soule had acquired the Corvette, Soule sold it to him, at which time he, Tabata, acquired the GMAC payment book, and thereafter made approximately 30 installments on the GMAC loan. Tabata, however, never advised GMAC that he had purchased the automobile nor that he was taking over the obligation to make the payment installments. He never checked the vehicle registration, never secured the certificate of title from Soule, never paid a sales tax on the sale, never received any kind of a receipt from Soule, nor did he ever pay directly any money to Soule.

Nevertheless, from that time onward, the Corvette was principally garaged at Auto–Truck Service & Supply Company. This business, a Minnesota corporation, is a

family owned business, principally operated by Tabata's father, engaged in the repair of automobiles and trucks and the occasional purchase and sale of automotive vehicles. Tabata's duties with the company included running the shop and coordinating the day to day activities of body men, mechanics and painters. After the Corvette initially became garaged at the business site, the company's logo was affixed to it; the vehicle was insured by the company; and, by using dealer plates on the infrequent occasions that the vehicle was operated, the vehicle was licensed by the company.[1]

In 1983 Soule told Tabata that to facilitate his securing another GMAC loan, the Corvette loan had to be "cleared up." Auto–Truck Service & Supply Company then issued a check, the proceeds of which paid off GMAC's remaining security interest. Thereafter, Tabata repeatedly asked Soule for the certificate of title. Tabata knew he was entitled to it, and he knew that he had to have the certificate to effectuate legal transfer of title. In response to Tabata's requests, Soule repeatedly claimed the certificate had been misplaced. Notwithstanding that claim, Tabata never insisted that Soule secure a duplicate replacement certificate of title nor did Tabata personally take action to acquire a certificate. *See, e.g.,* Minn.Stat. § 168A.09 (1986).

Approximately six months after GMAC's security interest in the Corvette had been paid off and satisfied, Soule pledged the Corvette as collateral for a $6,000 loan he secured from appellant bank by delivering to the bank the vehicle's certificate of title. At that time the certificate showed Soule to be the owner and disclosed that the prior GMAC security interest had been released.

Because Soule had a previous acceptable credit and checking history with the bank, it made the loan without formally checking either Soule's employment or references. It did, however, take the necessary legal steps to have itself listed as the holder of a security interest on the certificate of title which thereafter it retained in its possession.

For the following eleven months, until July 20, 1984, Soule timely made the installment payments on the bank loan. On July 20, 1984, at Soule's request, the bank revamped the loan by increasing it to $10,800. Thereafter, Soule made no further payments, and the bank's efforts to secure resumption of installment payments were unsuccessful. However, Soule and the bank agreed Soule would make interest payments until spring when the Corvette would be sold to pay off the unpaid principal of the bank loan. When ultimately this plan too failed, the bank sought to possess the vehicle. For the first time the appellant bank learned of Tabata's claim of ownership. The bank then commenced this replevin action against both Soule and Tabata.[2]

The disputed issue in the case is whether the rebuttable presumption that the holder of an automobile certificate of title, on which he is named as owner, is the owner of the vehicle, absent evidence to the contrary, is to be extended to commercial transactions so as to permit a claimant to defeat the security interest of a lender who has relied upon the information contained on the certificate. Or, to state the issue as it arose in this case, may one who has purchased ownership of a vehicle from the owner named on the vehicle certificate of title establish the fact of his purchase and

---

**1.** Apparently the Corvette was kept essentially for resale. Tabata testified that dealer plates are used for vehicles that are temporarily at Auto–Truck Service & Supply Company or put on a car for a day or two if a customer wants to drive a car prior to purchase. While in the possession of the garage, the Corvette had been driven by a number of persons, been offered for sale, and had been examined by a number of prospective purchasers.

**2.** The trial court held: (1) legal and equitable title vested with Tabata on March 2, 1983; (2) no security interest was created in favor of the bank on August 30, 1983; (3) bank was entitled to judgment against Soule for unpaid balance of Soule's loan plus interest, costs and attorney fees; (4) Tabata was entitled to judgment against Soule for attorney fees, lost wages and costs; and (5) Department of Transportation was directed to issue a new certificate of title to Tabata.

thereby defeat a claim of a lender possessing a security interest in the vehicle by virtue of reliance upon a certificate of title showing the transferor as the owner? Resolution of the issue involves the interpretation of Minn.Stat. § 168A.10, subds. 1, 2 and 5 (1986).

■ Tabata claims, and the trial court found, that the evidence establishes the transfer of the vehicle's ownership to him before Soule attempted to pledge it to the bank, and, therefore, the presumption that Soule, the possessor of the certificate of title to the vehicle, was the true owner was rebutted, and accordingly Tabata claims that his right to physical possession of the vehicle enjoys priority over the claim of the bank. In essence, he urges that the statute—Minn. Stat. ch. 168A—be so interpreted in a commercial transaction as to allow for a rebuttal of the facts that appear upon the face of the certificate. His rebuttal claim has its genesis in cases that arose prior to enactment of Minn.Stat. ch. 168A in 1971. Before the effective date of that statute, the law considered that possession of a certificate of title showing the possessor to be the owner constituted prima facie evidence of true ownership. However, the presumption of ownership was rebuttable. Thus, when ownership of a vehicle became an issue in a case, extrinsic evidence was admissible to overcome the statutory presumption and to establish, in fact, that title rested with a person other than the certificate holder or the person named in the certificate of title. *See generally, Gross v. Powell*, 288 Minn. 386, 181 N.W.2d 113 (1970) (title passes upon physical delivery notwithstanding subsequent dishonored

check); *Frye v. Anderson*, 248 Minn. 478, 487, 80 N.W.2d 593, 599 (1957) (jury may consider facts beyond title to determine ownership). Rebuttal of the statutory presumption was frequently permitted in cases involving attempts to impose vicarious liability pursuant to Minn.Stat. § 170.54 (1986) (the Safety Responsibility Act). *See, e.g., Gibeau v. Mayo*, 280 Minn. 170, 158 N.W.2d 589 (1968); *Arneson v. Integrity Mut. Ins. Co.*, 344 N.W.2d 617 (1984). Following enactment of Minn.Stat. ch. 168A in 1971, the ability to rebut ownership of the vehicle was greatly circumscribed. Thereafter, compliance by the owner with the transfer provisions of Minn.Stat. § 168A.10, subds. 1 and 2 (1986),[3] establishes an absolute defense to any claim attempting to impose vicarious liability on him under Minn.Stat. § 170.54 (1986). However, even after enactment of chapter 168A, noncompliance by a transferor with the statute provisions does not preclude the transferor from presenting extrinsic evidence relative to the true facts of the transaction to avoid the imposition to him of vicarious tort liability. *See, e.g., Welle v. Prozinski*, 258 N.W.2d 912 (Minn.1977).

■ In all our cases in which a rebuttable presumption has been applied or considered, both before and after 1971, the issue has surfaced and been addressed in the context of an inquiry to establish whether a particular person acquired ownership or title to an automobile either for the assessment of vicarious liability under Minn.Stat. § 170.54 (the Safety Responsibility Act) or under Minn.Stat. § 65B.48 (1986) (the Minnesota No Fault Act.)[4] In each of those situations the inquiry has

3. Relevant provisions of Minn.Stat. § 168A.10 (1986), governing the obligations of the transferor and the transferee of a motor vehicle, read:

   Subdivision 1. If an owner transfers interest in a vehicle other than by the creation of a security interest, the owner shall at the time of the delivery of the vehicle execute an assignment and warranty of title to the transferee in the space provided therefor on the certificate or as the department prescribes. * * * The transferor shall cause the certificate and assignment to be mailed or delivered to the transferee or to the department.

   Subd. 2. * * * [T]he transferee shall, promptly after taking delivery of the vehicle,

   execute the application for a new certificate of title in the space provided therefor on the certificate or as the department prescribes, and cause the certificate and application to be mailed or delivered to the department.

4. *See, e.g., Gross v. Powell*, 288 Minn. at 386, 181 N.W.2d at 113; *Frye v. Anderson*, 248 Minn. at 478, 80 N.W.2d at 593; *Gibeau v. Mayo*, 280 Minn. at 170, 158 N.W.2d at 589; *Welle v. Prozinski*, 258 N.W.2d at 912; *Arneson v. Integrity Mut. Ins. Co.*, 344 N.W.2d at 617; *BLC Ins. Co. v. Vivent*, 359 N.W.2d 315 (Minn.App.1984).

been focused upon the ascertainment of automobile ownership for the ultimate purpose of establishing the proper party against whom a tort claimant should address his or her tort-like claim for recovery of personal injury damages.[5] In neither has the claimant relied upon the certificate of title to change his or her position vis-a-vis the automobile or its owner. In contrast, in a commercial setting, a transferee of the vehicle, or, as in this case, one lending money, repayment of which is secured by the vehicle, does rely upon the certificate of title at the time to purchase or to loan money on security of the vehicle. Indeed, that right to rely seems to be the specific purpose underlying the 1971 statutory enactment. Notwithstanding this difference, Tabata now urges the court to write into the statute this rebuttable presumption analysis when considering priorities to the vehicle in a commercial transaction. We decline that invitation. In our opinion, were we to so hold the different public policy considerations prompting legislative enactment of Minn. Stat. ch. 168A in 1971 would be appreciably frustrated.

Act of April 27, 1971, ch. 162, 1971 Minn. Laws 325, now codified as Minn. Stat. ch. 168A, was patterned after the Uniform Motor Vehicle Certificate of Title and Anti–Theft Act.[6] We previously observed in *Welle v. Prozinski,* 258 N.W.2d 912, 916 (Minn.1977) that Minnesota's statutory enactment was directed to the alleviation of various problems which, with some frequency, arose under our prior statute. The 1971 statutory enactment surplanted the former system of motor vehicle registration in this state by establishing a system of vehicle registration employing a certificate of title concept. The present statutory scheme established the relationship between various parties and the subject-matter vehicle in a commercially reasonable and necessary manner. As a result, parties to a commercial transaction, whether it be sale or a security arrangement, were able to rely with practical certitude on what was inscribed on the certificate of title with respect to ownership and outstanding security interests much in the same way a vendee or mortgagee of real property has been able to rely upon a certificate of title issued under the Torrens system for the registration of title to real estate. *See, e.g.,* Minn. Stat. ch. 508 (1986). The statutory scheme clearly contemplated that the true owner possess the certificate of title which on its face identifies him as the owner. Thus, in the case of a sale, the statute imposes upon the transferor a duty to record an assignment and warranty of title by completing a space provided on the certificate itself. Minn.Stat § 168A.10, subd. 1 (1986). It also imposes the duty on a transferee to "promptly" execute an application, likewise provided on the certificate itself, for a new certificate. Minn. Stat. § 168A.10, subd. 2 (1986). The only exception is that a secured party having a security interest in the vehicle may retain possession of the certificate in certain circumstances. *See, e.g.,* Minn.Stat. § 168A.10, subd. 4 (1986). Finally, any purported transfer of ownership of a vehicle to a third party is ineffective to defeat the rights of one who has dealt with the registered owner as shown on the certificate of title. *See, e.g.,* Minn.Stat. § 168A.10, subd. 5 (1986). This system of single filing was obviously designed to protect all persons in commercial transactions involving the vehicle, especially transferees and secured parties.

In construing legislative enactments, our obligation is to ascertain and effectuate the

---

**5.** The public policy underlying the allowance of a rebuttable presumption analysis in this type of case is well explicated in *Welle v. Prozinski,* 258 N.W.2d at 912 and *Arneson v. Integrity Mut. Ins. Co.,* 344 N.W.2d at 617. The bar and the trial courts should not deduce from today's stated reluctance to extend this analysis to cases involving commercial transactions that we are in any way retreating from our holdings in those cases as well as holdings in similar cases arising before enactment of chapter 168A.

**6.** States besides Minnesota who have adopted the Uniform Act are Alabama, Connecticut, Georgia, Maine, Massachusetts, Mississippi, New Hampshire, New York, Rhode Island, and Vermont. Unif. Motor Veh. Cert. of Title and Anti–Theft Act, 11 U.L.A. 421 (1974 & Supp. 1988). Other states have enacted motor vehicle registration statutes which are substantially similar to the Uniform Act.

legislative intent. Minn.Stat. § 645.16 (1986). It seems obvious to us that the legislature designed this present system of single filing to afford protection to transferees and secured parties in commercial transactions involving the vehicle. Were we to accede to respondent's urging and thereby carve from the statutory design a rebuttable presumption under these circumstances, we would most certainly resurrect the often muddled uncertainty that was so prevalent in similar transactions before 1971—uncertainty which Minn.Stat. ch. 168A was clearly intended to remedy.

Moreover, our conclusion is bolstered by the interpretation given to statutory schemes by the courts of other states having the same, or substantially similar, statutory provisions. Georgia, as does Minnesota, follows the rebuttable presumption rule when a party seeks to avoid vicarious liability under the Motor Vehicle Accident Reparations Act (No Fault Act), but its courts strictly construe the Motor Vehicle Certificate of Title Act to protect third parties who rely on the certificate in commercial transactions. *See, e.g., American Mut. Fire Ins. Co. v. Cotton States Mut. Ins. Co.,* 149 Ga.App. 280, 253 S.E.2d 825 (1979). Likewise, the Nebraska Supreme Court has held "[t]he certificate of title act was enacted for the protection of owners of motor vehicles, those holding liens thereon, and the public." *Universal C.I.T. Credit Corp. v. Vogt,* 165 Neb. 611, 618–19, 86 N.W.2d 771, 776 (1957). So also, the Colorado Supreme Court has stated "[t]he purpose of [the Colorado Certificate of Title Act] is to insure that purchasers of automobiles, whether individual citizens or dealers, as well as lenders who finance automobile purchases, can readily and reliably ascertain the status of the seller's title to the automobile without recourse to other official state records." *Guy Martin Buick, Inc. v. Colorado Springs Nat'l Bank,* 184 Col. 166, 171–72, 519 P.2d 354, 357 (1974). *Accord Kovacich v. Norgaard,* 716 P.2d 633, 634 (Mont.1986). Today's decision recognizes the similar public policy expressed by those opinions. All of those decisions rest upon interpretation of statutes identical or similar to ours. All emphasize the public policy underlying the need for motor vehicle title registration acts—such as Minn.Stat. ch. 168A (1986)—to afford certainty in commercial transactions involving sales and financing of automobiles.

In addition to applying the rebuttable presumption analysis to this commercial setting, the trial court opined that the appellant's security interest in the Corvette was invalid, because under Minn.Stat. § 336.9—203(1)(c) (the Uniform Commercial Code) the debtor, Soule, did not possess rights in the collateral at the time he sought the loan and therefore a valid security interest could not be created. Because Minn.Stat. § 168A.10, subd. 5 provides that a transfer by an owner (here Soule) shall not be effective until the provisions of Minn.Stat. § 168A.10 have been complied with, the trial court erroneously concluded that Minn.Stat. § 336.9—203(1)(c) was useful to resolution of this priority dispute between the bank and Tabata.[7]

Therefore, we hold that in a suit involving a resolution of priority claims of parties to a motor vehicle arising out of a commercial transaction such as a purchase or the creation of a security interest, the rebuttable presumption of ownership rules shall not be extended so as to defeat the claim of transferees, holders of security interest, and others who have relied upon a motor vehicle certificate of title as provided in Minn.Stat. ch. 168A. Accordingly, we reverse and remand to the trial court for entry of judgment in favor of the appellant

7. As between Soule and Tabata, it is not only clear from our cases that Tabata could rebut the statutory presumption of ownership in Soule, but also Minn.Stat. § 168A.10, subd. 5 specifically permits extrinsic evidence on the ownership issue as between parties to a sale. *See, e.g., Farmers & Merchants Bank v. Holloway,* 159 Ga.App. 645, 284 S.E.2d 661 (1981); *Canal Ins. Co. v. Woodard,* 121 Ga.App. 356, 173 S.E.2d 727 (1970). The trial court's determination that as between Soule and Tabata, notwithstanding no

in its replevin action.[8] The judgment should further be amended to award Tabata the proper amount of his claim against Soule.

transfer of certificate of title, a sale had been completed was sustained by the record.

8. Although our holding makes it unnecessary to address respondent's equity issue, we do note that the equities do not preponderate in his favor. Had he, as transferee, fulfilled the duties imposed upon a transfereee under chapter 168A, he would have been fully protected and the bank as well would not have been out any money—at least out any money that was loaned to Soule on security of the certificate of title. *See, e.g.,* Minn.Stat. § 168A.07, 168A.09, 168A.10, subd. 2.