**HAMPTON BANK, Claimant and Third Party Plaintiff, Appellant,**

v.

**RIVER CITY YACHTS, INC., Respondent,**

**Robert M. Dorschner, Lower Court Respondent,**

**Mary C. DORSCHNER, Respondent,**

v.

**Nicholas HATTEN, et al., Third Party Defendants, Respondents,**

and

**Roger Pralle, et al., Third Party Defendants, Respondents.**

No. C5–94–1350.

Court of Appeals of Minnesota.

Feb. 28, 1995.

Review Denied April 27, 1995.

Douglas G. Peine, St. Paul, Loren M. Solfest, Larry S. Severson, Severson, Wilcox & Sheldon, P.A., Apple Valley, for appellant Hampton Bank.

T. Chris Stewart, Dunkley, Bennett & Christenson, Minneapolis, for respondent River City Yachts, Inc.

George L. May, Hastings, for respondents Nicholas Hatten, et al.

George E. Dow, Jr., Nelson, Casey, Tripp & Dow, P.A., Owatonna, for respondents Roger Pralle, et al.

Considered and decided by HARTEN, P.J., and PARKER and MANSUR,* JJ.

## OPINION

HARTEN, Judge.

Bank appeals an adverse judgment in the bank's replevin action against respondent purchasers of a yacht, wherein the bank's security interest in the yacht was defeated and respondents were awarded damages on their counterclaims for conversion and breach of contract. The bank also appeals awards of attorney fees to respondents. One set of respondents, by notice of review, challenges the amount of damages and attorney fees awarded. We affirm as modified in part and reverse in part.

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

## FACTS

River City Yachts, Inc. (RCY) was a boat dealership owned in equal shares by Robert Dorschner and Mary Dorschner, who also served as RCY's president and vice-president. In August 1991, RCY arranged for Hampton Bank (the Bank) to provide "floor-plan" financing for RCY. In return, RCY signed a security agreement granting the Bank a security interest in RCY's present and future assets, including inventory. The Bank perfected its security interest by filing a financing statement with the secretary of state. Under this arrangement, the Bank would loan RCY money to purchase an individual boat. When RCY sold the boat, the proceeds of the sale would be used to satisfy the loan. The Bank would then release the Manufacturer's Statement of Origin (MSO) for the boat.

In November 1992, the Bank loaned RCY $84,126.20 for the purchase of a 1993 model 47–foot Gibson Cabin Yacht (the yacht) and took possession of the yacht's MSO. On December 22,. 1992, respondents Nicholas and Avis Hatten agreed to purchase the yacht for $147,700. The Hattens traded in a 36–foot Carver boat, forgave a prior indebtedness of Robert Dorschner in the amount of $10,000, and remitted a check to RCY for $28,000, plus $1,820 sales tax. The Hattens stored the yacht with RCY. Apparently unaware of this sale, the Bank continued to hold the yacht's MSO. In February 1993, the Hattens instructed RCY and Robert Dorschner to sell the yacht. The trial testimony of Dorschner and the Hattens differed as to whether the Bank or the Hattens were to receive the proceeds from this second sale.

In the spring of 1993, the Bank discovered that RCY had breached the security agreement; the Bank commenced a replevin action, claiming that RCY was indebted to it in the amount of $319,374.12. On April 23, 1993, the trial court issued a replevin order granting the Bank possession and control of RCY's inventory, equipment, and receivables, and control of the RCY premises. RCY was to continue to run the business, with Robert Dorschner acting as the Bank's representative in selling the inventory. A list of RCY's assets subsequently compiled by the Bank and RCY included the yacht. On June 3, 1993, the replevin order was extended. By March 1, 1994, RCY and the Dorschners owed the Bank $91,744.04 plus certain expenses; only $10,387 remained owing on the yacht.

On June 11, 1993, respondents Roger and Kay Pralle agreed with RCY to purchase the yacht for $108,000. For consideration, the Pralles traded in a boat and paid $68,000, plus $4,420 sales tax. A week later, the Pralles put the yacht in the water, and on July 17, 1993, they sailed it to Wisconsin. The Pralles have since remained in possession of the yacht. The Hattens did not receive the proceeds from the Pralle sale. The Bank continued to hold the yacht's MSO.

Also in June, the Bank apparently first learned of the yacht sale to the Hattens when Nicholas Hatten met with the Bank. Hatten demanded either the MSO or $130,000, but the Bank refused both requests. Later that month, the Bank discovered that RCY had entered into a purchase agreement with the Pralles.

On July 22, 1993, RCY filed for bankruptcy. The bankruptcy stay was eventually lifted to allow the Bank to proceed in district court to determine which party had a superior interest in the yacht. On August 24, 1993, the Bank amended its replevin complaint, joining the Hattens and the Pralles as third-party defendants.

The case was tried from March 28 to April 12, 1994. The Bank, which still held the MSO, claimed a superior interest in the yacht under Minnesota's Watercraft Titling Act. The Hattens and Pralles responded that under Minnesota's enactment of the Uniform Commercial Code (UCC), they had purchased the yacht as buyers in ordinary course of business and, thus, free from any outstanding security interest. The Hattens also asserted claims against the Bank, RCY, and the Dorschners for fraud, conversion, breach of contract, and breach of warranty.

On motion for directed verdict, the trial court ruled that the Hattens and Pralles were buyers in the ordinary course of business under the UCC, awarded ownership of the yacht to the Pralles, and ordered the

Bank to release the MSO. A jury later found in favor of the Hattens on their conversion and breach of contract claims and awarded the Hattens damages in the amount of $115,020. The trial court denied the Bank's motion for a new trial, and ordered judgment against the Bank in the amended amount of $109,820. The trial court also awarded the Hattens $13,728.72 and the Pralles $18,551.25 in attorney fees. The Bank appeals from the judgment and the order denying its motion for a new trial, and challenges the attorney fee awards. The Hattens appeal the amount of damages and attorney fees awarded.

## ISSUES

1. Do the Hattens and Pralles qualify as buyers in the ordinary course of business and take the yacht free of the Bank's security interest, even though they obtained neither a certificate of title nor the yacht's MSO?

2. Did the trial court abuse its discretion in awarding attorney fees?

3. Did the trial court abuse its discretion in limiting the Hattens' attorney fee award to 30 percent of their total fees?

4. Did the trial court err in failing to enter judgment for the Bank against RCY and the Dorschners in order to indemnify the Bank for the attorney fees awarded the Hattens and Pralles?

5. Did the trial court err in holding the Bank liable as a principal on the Hattens' breach of contract claim?

6. Was there sufficient evidence that the Bank was a controlling creditor of RCY?

7. Did the trial court err in refusing to include a jury instruction on termination of agency?

8. Did the trial court err in refusing to include on the special jury verdict form a separate interrogatory on waiver?

9. Did the trial court err in limiting the damages on the Hattens' conversion claim to the amount realized from the sale of the yacht, instead of the fair market value?

10. Did the trial court err in reducing the damages awarded the Hattens by the jury?

## ANALYSIS

■ 1. **Interaction of U.C.C. and Watercraft Titling Act.** The trial court ruled that the Hattens and Pralles were buyers in the ordinary course of business under U.C.C. § 9–307(1) and that therefore they took the yacht free of the Bank's security interest. The Bank claims that, under the Watercraft Titling Act, neither the Hattens nor the Pralles qualified as buyers in the ordinary course of business because neither acquired a certificate of title or the MSO for the yacht. The interaction of these two statutes presents a question of law upon which we need not defer to the trial court. *Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n*, 358 N.W.2d 639, 642 (Minn.1984).

Minnesota's Watercraft Titling Act (WTA), Minn.Stat. §§ 86B.820–.920 (1992), and Minnesota's enactment of the UCC, Minn. Stat. §§ 336.1–101 to .11–108 (1992), both provide that a security interest in a watercraft ordinarily may be perfected only by notation on the boat's certificate of title. *Id.* §§ 86B.880, 336.9–302(3)(b). A security interest created by a dealer holding the watercraft for sale, however, is excepted from this requirement; rather, the dealer's secured party perfects a security interest by filing a financing statement with the secretary of state. *Id.* §§ 86B.875(3), 336.9–302(3)(b). The Bank properly perfected its security interest in the yacht.

■ The Hattens and Pralles rely on U.C.C. § 9–307(1):

A buyer in ordinary course of business (subsection (9) of section 336.1–201) takes free of a security interest created by the seller even though the security interest is perfected and even though the buyer knows of its existence.

Minn.Stat. § 336.9–307(1). Here, the security interest was created by the seller, RCY. A buyer in ordinary course is defined as follows:

"Buyer in ordinary course of business" means a person who in good faith and without knowledge that the sale to that person is in violation of the ownership rights or security interest of a third party

in the goods buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker. * * * "Buying" may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a preexisting contract for sale but does not include a transfer in bulk or as security for or in total or partial satisfaction of a money debt.

*Id.* § 336.1–201(9). "Buyer" is not otherwise defined in the UCC. It is undisputed that RCY was in the business of selling boats. Although the Bank argues that the Hattens and Pralles must have known that RCY was being financed and that the inventory was subject to a security interest, there is no evidence that they knew that their purchases of the yacht were *in violation of* the Bank's security interest. *See* U.C.C. § 9–307 cmt. 2, 3A U.L.A. 257 (1992); 2 James J. White & Robert S. Summers, *Uniform Commercial Code* § 26–13 (3d ed. 1988) (perfectly consistent for buyer to know of security interest, but to believe sale was not in violation of that interest). The Hattens therefore were buyers in the ordinary course of business with respect to their December 1992 purchase of the yacht. Accordingly, the Bank's security interest was then extinguished, and the Pralles later took the yacht free and clear of that security interest.

The Bank contends, however, that the following provision of the WTA precludes the Hattens and Pralles from being considered buyers in the ordinary course of business:

A person acquiring a watercraft through a sale or gift *does not acquire a right, title, claim, or interest in the watercraft until the person has been issued a certificate of title to the watercraft or has received a manufacturer's or importer's certificate.* A waiver or estoppel does not operate in favor of that person against another person who has obtained possession of the certificate of title or manufacturer's or importer's certificate for the watercraft for valuable consideration.

Minn.Stat. § 86B.825, subd. 5 (emphasis added). No certificate of title had been issued for the yacht, and the Bank still held the MSO at the time of trial. The Bank therefore contends that neither the Hattens nor the Pralles acquired any right, title, claim, or interest in the yacht, and could not be considered "buyers" of the yacht in determining whether U.C.C. § 9–307(1) applied. Consequently, the Bank's security interest would still be in effect, and it would be entitled to replevy the yacht. The interaction between Minnesota's UCC and the WTA presents an issue of first impression.

Article Nine of the UCC makes it clear that the perfection of the security interest in this case was governed by the UCC, not the WTA:

The filing of a financing statement otherwise required by this article is not necessary or effective to perfect a security interest in property subject to the following statutes or treaties; except that to the extent such statutes or treaties are silent on a specific matter, the provisions of this article shall govern: * * * (b) the following statutes of this state; (i) Sections 168A.01 to 168A.31 [motor vehicle titling statute] and 86B.820 to 86B.920 [Watercraft Titling Act]; but during any period in which collateral is inventory held for sale by a person who is in the business of selling goods of that kind, the filing provisions of this article (part 4) apply to a security interest in that collateral created by the person as a debtor.

Minn.Stat. § 336.9–302(3). Similarly, the WTA provides as follows:

The requirements of this chapter relating to security interests and certificate of title do not apply to or affect: * * * (3) a security interest in a watercraft created by a manufacturer or dealer who holds the watercraft for sale.

*Id.* § 86B.875. The issue, then, is whether this exception for dealer-held boats renders inapplicable subdivision 5 of section 86B.825, on which the Bank relies.

The Hattens and Pralles construe the dealer-held boats exception to mean that the "requirement" that a purchaser hold a certificate of title or MSO in order to acquire a right or interest in a boat does not apply. In other words, all issues concerning a security interest created by a dealer on a boat held

for sale are governed by the UCC and its buyer in ordinary course provision, not by the WTA.

The Bank, on the other hand, claims that this exception is meant only to correspond to U.C.C. § 9–302(3), and that the exception therefore affects only the *perfection* of security interests in boats. For instance, the provisions of the WTA requiring a dealer to apply for a new certificate of title in the name of the purchaser after selling a new boat would be relevant in the present case (although RCY failed to make this application after both sales of the yacht). The Bank also insists that, because subdivision 5 requires either a certificate of title *or an MSO*, the provision was meant to apply to dealers selling new boats for which no certificate of title exists.

■ In resolving this issue, we are guided by U.C.C. § 1–104:

This chapter being a general act intended as a unified coverage of its subject matter, no part of it shall be deemed to be impliedly repealed by subsequent legislation if such construction can reasonably be avoided.

Minn.Stat. § 336.1–104. Because the UCC and the WTA both apply, we must construe those statutes, if possible, to avoid irreconcilable differences. *D.W.H. ex rel. Mitchell v. Steele,* 494 N.W.2d 513, 515 (Minn.App.1993) (citing *Erickson v. Sunset Memorial Park Ass'n,* 259 Minn. 532, 543, 108 N.W.2d 434, 441 (1961)), *aff'd,* 512 N.W.2d 586 (Minn. 1994).

■ We believe that the statutes may be reconciled. While the WTA imposes certain titling requirements on all watercraft, it recognizes that special problems arise when a lender finances a dealer and takes a security interest in the dealer's inventory, i.e., the WTA provides that the perfection of such security interests is governed by the UCC. It appears reasonable that associated priority disputes should also be resolved under the UCC. The WTA itself provides that its requirements "relating to security interests and certificate of title do not apply to or affect" security interests in a dealer's inventory. Moreover, the secured party *expects*

the financed dealer to sell the inventory, and the UCC protects the secured party by granting it a security interest in the sale proceeds. Minn.Stat. § 336.9–306. Finally, this interpretation would further public policy because an opposite result would hinder trade in the watercraft industry. We believe it unlikely that the legislature, in enacting the WTA, intended to deny purchasers of watercraft from dealers the protection of the UCC's buyer in ordinary course provision.

The Bank nevertheless contends that subdivision 5 of section 86B.825 of the WTA would not have referred to the MSO unless it was intended to apply to new watercraft. It is at least probable, however, that the legislature provided for a purchaser to meet this requirement with the MSO in order to facilitate sale of watercraft brought to Minnesota from outside the state where the watercraft may not have been subject to certificate of title laws.

■ The Bank attempts to advance its position based upon the WTA's legislative history. None of the legislative history, however, speaks specifically to subdivision 5, the provision at issue. When enacted in 1989, the WTA had three purposes. First, titling of boats would combat theft by making the trafficking of stolen boats more difficult—purchasers could protect against buying stolen boats by making sure the certificate of title named the seller as the owner. Second, boat titling would resist financial fraud because security interests would be noted on the certificate of title; consequently, purchasers would be aware of any existing security interests and lenders would feel more secure about their security interests. Third and incidentally, revenue would be generated because sales tax on the sales of boats could be collected more easily. *See, e.g., Hearing on S.F. No. 84 Before the Senate Finance Committee* (May 2, 1989) (statements of Sen. A.W. Diessner); *Hearing on H.F. No. 56 Before the House Commerce Committee* (April 13, 1989) (statements of Rep. Leonard R. Price, Rep. Rich O'Connor).

■ The Bank argues that one of the purposes of the WTA was to protect banks and their security interests. The primary purpose, however, appears to have been to pro-

tect *consumers* from theft and financial fraud, particularly in *consumer-to-consumer* transactions. *See, e.g., Hearing on S.F. No. 84 Before the Public Lands and Waters Subcommittee to the Senate Environmental and Natural Resources Committee* (March 29, 1989) (statements of Al Brodie, advisor to North Central Marine Association, an organization of dealers). In a consumer-to-consumer transaction, a bank would be more willing to finance watercraft purchase and take a security interest if it could be certain that there were no prior security interests. The fact that security interests created by *dealers* were excepted from the WTA suggests that the legislature intended that such interests be governed by the UCC, which had already been enacted in Minnesota.

This view is buttressed by the opinions of commentators and courts in other states concerning the relationship between section 9–307 and motor vehicle titling statutes. White and Summers, in their treatise on the UCC, approach the problem as follows:

> Consider the situation in which the creditor takes a security interest in an automobile held for sale by a car dealer. Normally, no certificate of title is outstanding until a car is first sold at retail. Accordingly, any conflict between the secured party and the first retail purchaser of an automobile will usually be governed exclusively by the [Uniform Commercial] Code.

2 James J. White & Robert S. Summers, *Uniform Commercial Code* § 26–17 (3d ed. 1988) [hereinafter *White & Summers*]. For instance, in *Sterling Acceptance Co. v. Grimes,* 194 Pa.Super. 503, 168 A.2d 600 (1961), the lender's security interest had been noted on a special dealer's certificate of title. *Id.,* 168 A.2d at 601–02. The court held that the purchaser from the dealer was still a buyer in the ordinary course of business under U.C.C. § 9–307 and took free of the security interest, even though the security interest had properly been perfected under a certificate of title statute. *Id.,* 168 A.2d at 603.

Similarly, in *Associates Discount Corp. v. Rattan Chevrolet, Inc.,* 462 S.W.2d 546 (Tex. 1970), the Texas Supreme Court held that the purchaser of a new car took free of the security interest created by the dealer, even though the lender refused to give up the car's MSO. *Id.* at 550. The title statute in that case had provided that the exposure of a car for sale "shall not affect the rights of any mortgagee as against all third parties." *Id.* at 548. The court, citing U.C.C. § 1–104, found that the UCC and the title statute were "in pari materia" and therefore that section 9–307 still applied. *Id.* at 548–49; *see also Cunningham v. Camelot Motors, Inc.,* 138 N.J.Super. 489, 351 A.2d 402 (1975) (holding that purchaser was buyer in the ordinary course, despite fact that lender still held MSO); *Foy v. First Nat'l Bank,* 868 F.2d 251 (7th Cir.1989) (holding that a purchaser may be a buyer in the ordinary course and defeat a security interest, even if no insistence that the MSO accompany delivery).

White and Summers also believe that the purchaser of a *used* car should prevail over a secured party, even if the security interest has been noted on the car's certificate of title:

> Although we have found no case which squarely holds that the rights of a purchaser of a used car from a dealer are superior to those of a secured party who has recorded his security interest under a certificate of title act, the trend favors the purchaser. In this situation the purchaser's position is supported by sound technical and policy arguments. In the first place the misconduct of the dealers in these cases is normally more susceptible to control by the secured party than by a purchaser who has neither the leverage nor the opportunity to exercise control over a dealer. Secondly, the purchaser in such cases falls squarely within the class of persons section 9–307(1) is designed to protect. Moreover, section 9–302(3) does not render the whole of Article Nine inapplicable. It merely excludes some transactions from the Code's filing system.

*White & Summers* § 26–17. White and Summers conclude:

> In summary, we believe that courts should use 9–307 in virtually all cases to resolve disputes between a secured party and a subsequent purchaser of an automobile or

aircraft. Such a solution will promote uniformity and will yield a workable and well conceived rule for these cases. Although both the certificate of title act and the federal act [relating to aircraft] have provisions which arguably govern this priority conflict, neither indicates that its drafters considered the unique policy issues involved.

*Id.*

■ Relying on either section 9–307 or section 2–403 of the UCC, courts in a number of other states have held in favor of a motor vehicle purchaser over a secured party, even when faced with statutory language identical to Minn.Stat. § 86B.825, subd. 5. *See, e.g., Correria v. Orlando Bank & Trust Co.,* 235 So.2d 20 (Fla.Dist.Ct.App.1970) (holding that purchaser of used car from dealer was buyer in ordinary course under sections 9–307 and 2–403, even though lender still held certificate of title); *Dugdale of Nebraska, Inc. v. First State Bank,* 227 Neb. 729, 420 N.W.2d 273 (1988) (finding it unnecessary to determine whether section 9–307 applied because purchaser was buyer in the ordinary course under section 2–403, and citing similar cases from 13 other states). U.C.C. § 2–403 provides that a buyer in ordinary course of business who purchases goods that have been "entrusted" to a dealer acquires all rights in the goods formerly held by the "entruster." Minn.Stat. § 336.2–403. In the present case, the Bank, which expected RCY to sell its inventory, can be said to have entrusted the inventory collateral to the merchant RCY; therefore, section 2–403 would have the same effect as section 9–307 in this case. *See White & Summers* § 26–16 ("Section 2–403 is the Article Two analogue to 9–307.").[1]

In other jurisdictions, then, the present case would likely be resolved in favor of the Hattens and Pralles as buyers in the ordinary course of business, either under section 9–307 or section 2–403. Cases from other states are instructive because the UCC and Minnesota's car titling act (based on the Uniform Motor Vehicle Certificate of Title and Anti-Theft Act) are uniform laws. *See* Minn. Stat. § 645.22 (1992) ("Laws uniform with those of other states shall be interpreted and construed to effect their general purpose to make uniform the laws of those states which enact them."). In addition, this view does not conflict with our courts' prior treatment of the state's motor vehicle titling statute. *See Welle v. Prozinski,* 258 N.W.2d 912, 916 (Minn.1977) (holding that normal presumption of ownership in favor of holder of motor vehicle certificate of title may be rebutted, despite language of Minn.Stat. § 168A.10, subd. 5 providing that the transfer of a motor vehicle is not effective until titling requirements are complied with); *see also* Minn. Stat. § 168A.05, subd. 6 (motor vehicle certificate of title is only prima facie evidence of facts appearing on it); Minn.Stat. § 86B.830, subd. 3(b) (same for watercraft certificate of title).

In ·*Bank North v. Soule,* 420 N.W.2d 598 (Minn.1988), the seller of an automobile (who was not a dealer) retained the certificate of title, then used the certificate to obtain a loan, with the bank taking possession of the certificate and a security interest in the previously-sold automobile. *Id.* at 599–600. The court rejected the purchaser's argument that the bank was entitled only to a rebuttable presumption of ownership, and held that the certificate of title conclusively established ownership in the bank. *Id.* at 603.

*Bank North* does not govern the present case, however. There the bank took its security interest *after* the car had been sold to

---

1. The Bank argues that titling requirements should be more stringent for boats than for automobiles because boats are more likely to be stored with the dealer after purchase, thereby making it more difficult for lenders to know which boats have been sold. Consequently, the Bank would distinguish the above cases and commentary, all of which concern automobiles.

The WTA's legislative history reveals that the WTA was intended to parallel Minnesota's motor vehicle titling system; indeed, the WTA's sponsor in the Senate stated that the WTA was copied almost word-for-word from the motor vehicle titling statute. *Hearing on S.F. No. 84 Before the Public Lands and Waters Subcommittee to the Senate Environmental and Natural Resources Committee* (March 29, 1989) (statements of Sen. A.W. Diessner); *see also Hearing on H.F. No. 56 Before the House Commerce Committee* (April 13, 1989) (statements of Rep. Leonard R. Price). It is likely that the legislature intended the WTA to function like the motor vehicle titling statute, Minn.Stat. §§ 168A.01–.31 (1992), and to yield similar results.

the purchaser, and the supreme court emphasized the bank's reliance on the certificate in taking that security interest. In its holding, the court specifically stated that the rebuttable presumption cannot be used in commercial cases to defeat those "who have relied" on the title certificate. In the instant case, no certificate of title had yet been issued, and the Bank took its security interest *expecting* that RCY would sell the yacht.

■ In summary, we believe that the legislature, in enacting the WTA, did not intend to repeal U.C.C. § 9–307 as it applied to the purchase of watercraft; rather, the legislature intended the UCC to govern priority disputes involving dealer-created security interests in inventory. This approach is consistent with the purposes of both the WTA and the UCC, as well as public policy. It is also in line with the commentators and courts in other states.

■ We hold that a purchaser of a watercraft from a dealer may qualify as a buyer in ordinary course of business and take free of a prior security interest, even if the purchaser has not obtained a certificate of title or the MSO for the watercraft. Accordingly, we affirm the trial court ruling that the Pralles own the yacht free of the Bank's security interest. Because we hold that the Bank's security interest in the yacht was extinguished when the Hattens purchased the yacht, the Bank had no right to the proceeds from the sale of the yacht from the Hattens to the Pralles, and therefore remains liable to the Hattens in conversion.

■ **2. Awards of Attorney Fees.** The Bank appeals the trial court's awards of attorney fees to the Hattens and Pralles under Minn.Stat. § 549.21, subd. 2 (1992). That statute allows a court to award reasonable attorney fees if the party charged

> acted in bad faith; asserted a claim or defense that is frivolous and that is costly to the other party; asserted an unfounded position solely to delay the ordinary course of the proceedings or to harass; or committed a fraud upon the court.

*Id.* We will not reverse a trial court's award of attorney fees under this provision absent an abuse of discretion. *Radloff v. First Am.*

*Nat'l Bank,* 470 N.W.2d 154, 156 (Minn.App. 1991), *pet. for rev. denied* (Minn. July 24, 1991).

Finding that the Bank's position with respect to the yacht was frivolous and in bad faith, the trial court initially awarded $17,-851.25 attorney fees to the Pralles. The trial court stated that the Bank should have brought a declaratory action to determine ownership of the yacht, instead of seeking to replevy the yacht and recover damages for wrongful detention; therefore the trial court awarded the Pralles all of their attorney fees, less $3,000 that the Pralles would have spent defending a declaratory action. The trial court found that the Bank had acted in bad faith by first permitting Robert Dorschner, its designated representative, to sell the yacht, then claiming the yacht as collateral, all while claiming that costs of collection, including attorney fees, should be assessed against the yacht. The trial court also stated that the Bank's position in relation to the Pralles was frivolous because the Bank sought protection under the UCC regarding its security interest, but attempted to deny the Pralles the protection of the UCC's buyer in ordinary course provision.

In a subsequent order, the trial court awarded the Hattens $13,728.72, which represented 30 percent of their total attorney fees; it found that the Hattens' own claims against the Bank accounted for the other 70 percent of their fees. The trial court again declared that the Bank's position had been frivolous and in bad faith because the Bank sought relief under the UCC while denying the same to the Hattens and Pralles. The trial court also awarded an additional $700 in attorney fees to the Pralles for their defense of the earlier fee award.

■ In support of the attorney fee awards, the Pralles cite *Knecht Bros. v. Ames Constr., Inc.,* 404 N.W.2d 859 (Minn. App.1987), in which we held that the clear application of a UCC provision made the appellant's position frivolous. *Id.* at 861. Similarly, in *Summit House Co. v. Gershman,* 502 N.W.2d 422 (Minn.App.1993), this court concluded that the appellant's claim was frivolous because the appellant's inter-

pretation of the law was contrary to existing law. *Id.* at 425. In the instant case, however, no Minnesota law existed on the issue, and the application of the UCC provision was unclear.

We hold that the Bank's position was not frivolous or taken in bad faith. Although the Bank's reliance on the WTA provision proved unconvincing, its position was sufficiently grounded in the statute. *See Nelson v. Engen,* 347 N.W.2d 57, 61 (Minn.App.1984) (holding that appellant's innovative theory based on Minnesota's No–Fault Act, although in error, was not frivolous). In addition, the Bank instituted proceedings to determine the yacht's ownership as soon as RCY declared bankruptcy and the Bank realized that it would not receive the proceeds of the sale to the Pralles. Moreover, the Bank's amended complaint *did* seek a declaratory judgment on the ownership issue, and the Bank's assertion of all other possible rights in the complaint was not improper.

The trial court itself struggled with the ownership issue, hearing arguments three different times before eventually ruling against the Bank. Ownership was also the subject of the Pralles' motion for summary judgment, which the trial court denied. Obviously, the trial proceedings could have been simplified if the trial court had expedited its ruling on ownership.

 This court has held that [a] party who survives pretrial motions to dismiss and for summary judgment should not be subject to sanctions after trial on the surviving claims.

*Empire Fire & Marine Ins. Co. v. Carlson,* 476 N.W.2d 666, 670 (Minn.App.1991) (citing *Uselman v. Uselman,* 464 N.W.2d 130, 144 (Minn.1990)). As one commentator has noted:

> The interest in the early disposition of meritless cases is not served * * * when post-trial motions for Rule 11 sanctions, based on the filing of a frivolous complaint, are granted when the moving party previously lost a summary judgment motion. Such rulings only encourage a "never say die" attitude toward sanctions motions and increase the burden of satellite litigation.

* * * A party who has survived a summary judgment motion or a motion to dismiss certainly has no reason to believe that the court considers its claim or defense frivolous; indeed, the opposite is the case.

*Uselman,* 464 N.W.2d at 144–45 (quoting Melissa L. Nelken, *Has the Chancellor Shot Himself in the Foot? Looking for a Middle Ground on Rule 11 Sanctions,* 41 Hastings L.J. 383, 390–91 (1990)). We believe that the same rationale should govern sanctions under section 549.21. Therefore, because the trial court denied the Pralles' motion for summary judgment (and did not take advantage of other opportunities to resolve the issue before trial), the Bank's position cannot be considered frivolous. *Cf. Norwest Bank Midland v. Shinnick,* 402 N.W.2d 818, 826 (Minn.App.1987) (upholding attorney fees awarded by trial court after respondent's dispositive motion had been denied, when motion came during trial and trial court wanted to let the jury decide the case because it had already gone that far).

Finally, the trial court found that the Bank acted in bad faith in dealing with the respondents both in the context of this litigation and in its conduct prior to the case. We have held, however, that fees may be awarded under this section

> only where the bad faith occurs with respect to the litigation itself, not with respect to the underlying cause of action.

*Bank of Elbow Lake v. First State Bank,* 439 N.W.2d 53, 56 (Minn.App.1989), *pet. for rev. denied* (Minn. July 12, 1989).

Because the trial court thought that the Bank should have attempted to resolve the ownership issue through a declaratory action, the court did *not* award fees for the amount that the parties would have spent defending such an action. Had the Bank brought a declaratory action, however, it would have adopted the same position, relied on the WTA provision, and asserted that the respondents were not buyers in the ordinary course of business. We believe it is illusory for the trial court to base the awards of fees primarily on the Bank's purportedly inferior choice of remedy while denying the respondents awards for fees that would have been

spent in defending a declaratory action when either action could yield the same result.

In summary, then, the trial court found that the fee awards were not based on the Bank's request for a declaratory judgment; nor were they based on the claims the Hattens were forced to file. That leaves only the Bank's wrongful detention claim as the basis for the trial court's decision, and awarding fees solely on that basis is unjustified. We hold that the trial court abused its discretion in awarding attorney fees under Minn.Stat. § 549.21. Accordingly, we reverse the awards of attorney fees to the Hattens and the Pralles.

3. **Limitation of Hattens' Attorney Fee Award.** Because we hold that the Hattens were not entitled to attorney fees, we need not discuss their claim for a greater fee award.

4. **Indemnification of the Bank for Attorney Fee Awards.** Similarly, our decision for the Bank concerning the attorney fee awards renders moot the issue of whether the Bank should be indemnified for those awards by RCY and the Dorschners. We agree with the trial court, however, that bad faith attorney fees are not, as a general rule, proper collection and enforcement costs for which a lender may be indemnified.

5. **The Bank's Liability on Breach of Contract Claim.** The Bank argues that the jury's answers to the special verdict interrogatories do not support the trial court's conclusion that the Bank is liable to the Hattens for breach of contract. We apply the following standard of review:

> A trial court has broad discretion to liberally construe an inconsistent verdict to effect the intention of the jury and to harmonize answers if possible. The test is whether the answers can be reconciled in any reasonable manner consistent with the evidence and its fair inferences.

*Veit & Co., Inc. v. Lowry Hill Constr. Co.,* 409 N.W.2d 47, 49 (Minn.App.1987) (citations omitted), *pet. for rev. denied* (Minn. Sept. 30, 1987).

In its answers to the interrogatories in the section of the verdict form captioned "Breach of Contract," the jury found that Dorschner or RCY breached an agreement to pay the sale proceeds to the Hattens, and that the Bank was a controlling creditor of RCY. On that basis, the trial court held the Bank liable as a principal for its agent's breach of contract. In two answers in the section captioned "Fraud," however, the jury found that Dorschner acted as an individual, not as an officer of RCY or an agent of the Bank, in connection with his dealings with the Hattens after April 23, 1993. The Bank argues that even if the jury found that an agency relationship did exist between the Bank (as controlling creditor) and RCY or Dorschner, it also found that Dorschner was *not* acting as the Bank's agent when he breached his contract with the Hattens. Therefore, the Bank asserts that it should not be held liable as a principal on the breach of contract claim.

The Hattens contend that, because those interrogatories were framed within the context of the fraud claim, the jury only found that Dorschner acted individually when he *defrauded* the Hattens, not when he breached his contract with the Hattens. Therefore, the Bank should remain liable on the breach of contract claim.

The Bank responds that the interrogatories as to whether Dorschner acted either as an individual or as an agent of the Bank or RCY are relevant to—and therefore apply equally to—the fraud and breach of contract claims. The Bank argues that, because the interrogatories did not also appear in the "Breach of Contract" section of the verdict form, the answers were meant to apply to each cause of action.

If the Bank's argument is accepted, then the controlling creditor interrogatory would appear unnecessary; the interrogatory only has meaning if it controls the breach of contract issue, as the Hattens contend. Nevertheless, the jury found that Dorschner acted individually "in connection with his dealings with the Hattens"—an answer not limited to the fraud cause of action. In addition, the jury likely did not mean that Dorschner acted individually while defrauding the Hattens but as an agent of the Bank or RCY in breaching his contract with the Hattens, be-

cause the two claims arose from the same acts, i.e., not giving the Hattens the proceeds from the sale to the Pralles.

We believe that the jury's answers may be reconciled. The jury first found that either RCY or Robert Dorschner breached the contract with the Hattens. The interrogatory whether the Bank was a controlling creditor of RCY was relevant only if RCY, not Dorschner, breached the contract. When it subsequently found that Dorschner acted individually in dealing with the Hattens, the jury essentially concluded that Dorschner, not RCY, breached the contract. Because the jury might have found that RCY breached the contract, the controlling creditor *interrogatory* was necessary; when the jury actually found that Dorschner individually breached the contract, however, the jury's *answer* to the controlling creditor interrogatory became irrelevant. Therefore, we hold that the trial court abused its discretion in so construing the jury's answers as to hold the Bank liable to the Hattens on the breach of contract claim. Accordingly, we reverse the trial court on that issue.

**6–7. The Bank as Controlling Creditor; Termination of Agency Jury Instruction.** Because we hold that the Bank is not liable to the Hattens on their breach of contract claim, we need not consider whether there was sufficient evidence for the jury to find that the Bank was a controlling creditor of RCY, or whether the jury should have received an instruction on termination of agency.

 **8. Special Verdict Interrogatory on Waiver.** Finally, the Bank challenges the trial court's refusal to submit an interrogatory on waiver. Generally, the trial court has broad discretion as to the form of special verdict interrogatories. *Dang v. St. Paul Ramsey Medical Ctr.,* 490 N.W.2d 653, 658 (Minn.App.1992), *pet. for rev. denied* (Minn. Dec. 15, 1992). Parties are entitled to have all issues of fact submitted to the jury. *Kath v. Burlington N. R.R.,* 441 N.W.2d 569, 572 (Minn.App.1989), *pet. for rev. denied* (Minn. July 27, 1989).

 At trial, the Bank challenged the Hattens' claim to the proceeds of the yacht sale to the Pralles on theories of both waiver and estoppel, and the trial court instructed the jury on both theories. Nevertheless, the trial court submitted only an interrogatory on estoppel. The jury subsequently found that the Hattens were not equitably estopped from recovering on its conversion claim.

The Bank emphasizes that waiver and estoppel are distinct concepts:

> Waiver is the voluntary relinquishment of a known right. Estoppel results from acts or omissions which cause another to change his position for the worse in good-faith reliance upon such conduct.

*Niazi v. St. Paul Mercury Ins. Co.,* 265 Minn. 222, 228 n. 5, 121 N.W.2d 349, 354 n. 5 (1963) (citations omitted). The Bank contends that, whereas the jury may have found that the Hattens were not estopped because the Bank did not change its position in reliance on the Hattens' conduct, the jury nonetheless could have reasonably concluded that the Hattens had waived their claim by voluntarily relinquishing their right to the sale proceeds. At trial, Robert Dorschner testified that the Hattens told him to give the proceeds to the Bank, and the Bank claims that this testimony raised an issue of fact as to whether the Hattens waived their right to the proceeds. Because the jury did not receive a separate interrogatory on waiver, the Bank submits that the jury was prevented from resolving that fact question. We disagree.

In addition to the interrogatory on estoppel, the jury was asked:

3. Did the Hattens ever consent to and direct Robert Dorschner and/or River City Yachts, Inc. to pay their boat proceeds to Hampton Bank?

8. Did the Hampton Bank receive proceeds from the sale of the subject Gibson Houseboat to the Pralles to which the Hattens were entitled?

The trial court permitted the Bank to argue the waiver issue in its closing argument in the context of the estoppel interrogatory and the two interrogatories quoted above. Nevertheless, the jury answered all three against the Bank.

The Bank argues that the Hattens waived any claim to the proceeds when they told RCY and Robert Dorschner to give the Bank the proceeds. The jury's answers to interrogatories 3 and 8 indicate that the jury did not believe Dorschner's testimony on that point. We agree with the trial court that the interrogatories actually submitted sufficiently addressed the waiver issue; consequently, we hold that the Bank is not entitled to a new trial on that basis.

**9. Limitation of Conversion Damages.** By notice of review, the Hattens claim that the trial court erred by limiting damages on their conversion claim to the sale proceeds instead of the fair market value of the yacht. The Hattens argue that they never consented to the sale of the yacht to the Pralles because when RCY, as the Bank's agent, failed to turn over the proceeds from the sale, the sale was no longer consistent with the Hattens' original consent. Therefore, the Hattens claim that the Bank converted the yacht and that appropriate damages would then have been the yacht's fair market value.

The trial court granted the Bank's motion for directed verdict on the Hattens' claim that the Bank had converted the yacht, and the jury only decided whether the Bank converted the *proceeds* from the sale of the yacht. Therefore, the trial court properly limited damages to the amount of those proceeds.

Apparently the Hattens' dissatisfaction focuses upon the directed verdict on its claim that the Bank converted the yacht; but the Hattens failed to raise this issue by challenging the directed verdict. Regardless, such a challenge is without merit. It was undisputed that the Hattens gave RCY and Robert Dorschner permission to sell the yacht on their behalf. The Hattens had not withdrawn this permission by June 11, 1993, when the yacht was sold to the Pralles. The Hattens then lost all interest in the yacht. Therefore, the Hattens never wrongfully lost dominion over the yacht, and the trial court

was correct in ruling that the yacht could not have been converted by the Bank.

**10. Reduction of Damages to Hattens.** The Hattens also argue that the trial court erred in reducing the damages awarded by the jury. The jury originally awarded the Hattens $108,000 (the sale price paid by the Pralles) plus $7,020 (representing 6.5% sales tax on $108,000), for a total award of $115,020. In its amended order, however, the court reduced the award to $109,820, upon the following conclusion of law:

> That there was not sufficient evidence for the jury to find that $7,020.00 was applicable to the sale of the boat to the Hattens. However, Exhibit 17 [the Hattens' purchase agreement with RCY] provides evidence that there was $1,820.00 in sales tax applicable to the sale of the boat to the Hattens.

The trial court correctly stated that there was no evidence that $7,020 was ever paid as sales tax on the yacht; the trial court erred, however, in concentrating on the sale of the yacht to the Hattens. The jury awarded the Hattens damages in the amount of the proceeds from the sale of the yacht to the *Pralles*. Therefore, any damages reflecting sales tax paid on the yacht must equal the tax paid by the *Pralles,* not the Hattens. The evidence showed indisputably that the Pralles paid $4,420 in sales tax. *See* Minn. Stat. § 297A.01, subd. 8 (1992) ("sales price," by which sales tax is figured, does not include the value of a trade-in). Therefore, the proper damage award is $108,000 plus $4,420, or $112,420, and we modify the judgment amount accordingly.[2]

## DECISION

The Watercraft Titling Act does not defeat the Hattens' claim as buyers in the ordinary course of business under the UCC; consequently, the Pralles, as purchasers from the Hattens, retain the yacht free of the Bank's security interest, and the Bank remains liable to the Hattens for converting the proceeds from the sale of the yacht to the Pralles. The trial court abused its discretion

---

**2.** The question of whether sales tax was applicable to the transaction was not raised on appeal and is not before us.

in awarding attorney fees. The trial court also erred in holding the Bank liable to the Hattens for breach of contract. The trial court did not err in refusing to include a separate verdict question on waiver. Finally, the court properly limited damages on the conversion claim to the yacht's sales price; however, judgment is modified to $112,420.

**Affirmed as modified in part and reversed in part.**